**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF NEW MEXICO**

_____

CAROL FOX and GLENN FOX,
Wife and Husband,

                  Plaintiffs,

        vs.                                No. CIV. 97-0907 BB-DJS

LYNN HARRIS, FARMLAND INDUSTRIES, INC.,
and TRICK ENTERPRISES, INC.,

                  Defendants.

## MEMORANDUM OPINION

THIS MATTER comes before the Court on the Motion of Defendant Trick Enterprises, Inc., for Summary Judgment (Doc. 30) filed March 27, 1998.  Having reviewed the submissions of the parties and the relevant law, the Court finds that defendant's motion should be DENIED.

### I.  Facts and Procedural History

Plaintiffs Carol Fox and Glenn Fox purchased racing fuel or gasoline from Defendant Trick Enterprises, Inc. (hereafter referred to as "Trick") in a transaction effected by telephone. Trick hired Defendant Farmland Industries, Inc. (hereafter referred to as "Farmland") to transport the fuel from Texas to plaintiffs in Albuquerque.  The invoice between Trick and Farmland contained the phrase, "F.O.B. Borger TX."

Defendant Lynn Harris, an employee of Farmland, drove a Farmland gasoline truck to Albuquerque, where plaintiffs were waiting with a van full of 55-gallon drums.  Both of the plaintiffs physically assisted Harris in getting the fuel from the Farmland truck into the drums. The fuel was initially unloaded into the drums by the gravity feed method.  When this method no

longer worked efficiently, Mr. Harris switched to a pumping method to fill the drums. For this method, he needed the help of both plaintiffs. All three parties had used this method before, on previous deliveries. Harris was stationed at the truck near a clutch used to control the flow of gasoline from the pump. Plaintiffs were stationed at the drums, which were located inside the van. A hose ran from the tanker truck to the van. Glenn Fox held a nozzle at one of the openings in the top of the drum, while Harris operated the clutch near the front of his truck. Carol Fox kneeled on top of the drum and shined a flashlight into the openings to see how full the drum was getting, signaling Harris at the appropriate time to cut off the flow.

Carol Fox's injuries occurred shortly after she signaled to Harris that the drum was almost full. Plaintiffs allege that Harris mishandled the clutch, causing gasoline to spurt from holes in the top of the drum, dousing Ms. Fox on her face and body. Because she couldn't breathe, she leaped in a panic from the drum and the van and landed on the ground, crushing both of her heels.


Plaintiffs sue Trick, Farmland, and Harris for Carol's injuries and Glenn's loss of consortium and also seek punitive damages against Farmland. Trick has moved for summary judgment, arguing it is not liable for anything done by Farmland or its employee. For the reasons given below, the motion is Denied.

## II. Analysis

A. Introduction.

The general rule, that an employer is not liable for the actions of its independent contractor, is riddled with exceptions. This case turns on the exception for inherently dangerous activities carried out by the contractor, Farmland Industries. The Court finds that the dispensing

2

of bulk quantities of gasoline as was done in this case is an inherently dangerous activity which renders the employer, Trick Enterprises, liable and, in addition, the Court rejects Trick's contention that Farmland was the contractor of plaintiffs rather than of Trick. The motion for summary judgment will therefore be denied.

B. The handling of gasoline as undertaken in this case was an inherently dangerous activity, rendering Trick liable for the acts of the independent contractor whom it hired to deliver and dispense the fuel.

1. Basic rule of nonliability and exceptions thereto.

The general rule is that the employer of an independent contractor is not liable for physical harm caused to another by an act or omission of the contractor or his servants. Restatement (Second) of Torts §409 (1965); Pendergrass v. Lovelace, 262 P.2d 231, 232 (N.M. 1953). However, "it would be proper to say that the rule is now primarily important as a preamble to the catalog of its exceptions," Pacific Fire Ins. Co. v. Kenny Boiler & Mfg. Co., 277 N.W. 226, 228 (Minn. 1937), and the rule has been so eroded that it is now 'general' only in the sense that it is applied where no good reason can be found for departing from it. Restatement (Second) of Torts §409 cmt. b (1965).

The exceptions to the general rule "overlap and shade into one another; and cases are infrequent in which at least two of them do not appear. The courts quite typically state and rely upon two or more, as alternative or cumulative grounds." W. Page Keeton et al., Prosser and Keeton on the Law of Torts §71, at 510 (5th ed. 1984). In the present case, plaintiffs argue that Trick is liable both for its own negligence and for the acts of its independent contractor in carrying out an inherently dangerous activity.

3

2.  <u>Trick is not liable for any negligence of its own</u>.

a.  <u>Retained control</u>.

An employer may be liable for its own negligence in failing to exercise due care in carrying

out portions of a task over which it retains some control, even where the overall task is entrusted

to an independent contractor.  The employer need not retain such control over the details of the

work as to create a master-servant relationship between itself and the contractor in order to

invoke this duty; a lower level of retained control can render the employer responsible for

exercising reasonable care for the protection of others:

> One who entrusts work to an independent contractor, but who
> retains the control of any part of the work, is subject to liability for
> bodily harm to others, for whose safety the employer owes a duty
> to exercise . . . his control with reasonable care . . .   The employer
> may . . . retain control less than that which is necessary to subject
> him to liability as master.  He may retain only the power to direct
> the order in which the work shall be done.  Such a supervisory
> control may not subject him to liability under the principles of
> Agency, but he may be liable under the rule stated in this Section
> unless he exercises his supervisory control with reasonable care so
> as to prevent the work which he has ordered to be done from
> causing injury to others.

<u>DeArman v. Popps</u>, 400 P.2d 215, 219 (N.M. 1965), quoting from <u>Restatement (Second) of</u>

<u>Torts</u> §414 and cmt. c thereto.

If "the independent contractor controls how and when the work is to be done, there is

probably not sufficient retained control to subject [the employer] to liability.  Similarly, if the

employer retains only the right to require that the contractor observe safety rules and practices but

assumes no affirmative duties and never directs the method of performance, there is insufficient

control or supervision to render it liable."  <u>Jones v. Chevron U.S.A., Inc.</u>, 718 P.2d 890, 896

4

(Wyo. 1986).  The issue of whether the employer has retained the sort of control which will expose him to liability is an issue of fact which, when disputed, precludes summary judgment. Moulder v. Brown, 644 P.2d 1060, 1066 (N.M. App. 1982) ("since the facts regarding the condition of the work and also the issue of control are disputed, we conclude that there are general issues of material fact for the trier of fact or the jury"); see also Tipton v. Texaco, 712 P.2d 1351, 1358 (N.M. 1985); Requarth v. Brophy, 801 P.2d 121, 126 (N.M. App. 1990).

Plaintiffs have adduced no evidence that Trick retained any control, or any right of control, over the method of delivering and dispensing the gasoline that it sold to plaintiffs.  Thus, although "control" may be shared, and the right to control need not be exercised in order to hold the employer liable, Hinger v. Parker & Parsley Petroleum Co., 902 P.2d 1033, 1046-47 (N.M. App. 1995), plaintiffs in the present case has failed to come forward with sufficient evidence to get to the jury on this issue.

Plaintiffs argue that Trick "had an element of control over Farmland . . . and its employees" in that it hired Farmland to deliver its fuel to the plaintiffs and was aware that the fuel was to be unloaded into drums.[1]  However, the simple act of hiring an independent contractor does not establish "control"; otherwise, there would be no need for the special rule embodied in Restatement §414.  In addition, awareness that the fuel was to be unloaded into drums does not establish that Trick controlled the method of unloading.

Plaintiffs also argue that Trick instructed the driver Harris "to drum the racing fuel" for plaintiffs, apparently meaning that Trick told Harris that the fuel was to be dispensed into individual drums rather than into a storage tank.  The record citations supplied by plaintiffs do not

---

[1] Plaintiffs' Response at 1.

support this assertion.  Lynn Harris in his deposition states only that it was either Trick "or our other driver who had been there before" who told him the fuel was going into 55-gallon drums. In any case, there is no indication that Trick told Mr. Harris <u>how</u> to put the fuel into the drums, whether by gravity feed or pumping, and the fact that Trick may have told him that the fuel was destined for drums does not have any bearing on whether it "retained control over any part of the work."  And, as Defendant points out, there is no evidence that the practice of putting fuel into drums is improper; rather, it appears to be a common practice.[2]

There is nothing on the record to show that Trick directed the method of performance of Farmland or Mr. Harris, nor that Trick assumed affirmative duties with respect to the safety of the undertaking.  Rather, the arrangement is a classic employer - independent contractor relationship, where Trick delegated to Farmland performance of the task of shipping the gasoline out to Albuquerque and dispensing it into plaintiffs' drums, retaining control only generally over a satisfactory result.  This is not a situation, as are many of the "retained control" cases, where the employer is either the landowner, or has a person at the scene of the work who directs or oversees the operation.

### b.  <u>Failure to interfere to put a stop to known dangerous practices</u>.

Even if an employer does not retain control over the details of the work, it may still be liable for its own negligence in failing to "interfere to put a stop" to dangerous conditions negligently created by the contractor, if the employer had actual or constructive notice of the conditions.  <u>Seal v. Carlsbad Indep. Sch. Dist.</u>, 860 P.2d 743, 747 (N.M. 1993), <u>citing</u> <u>Emelwon, Inc. v. United States</u>, 391 F.2d 9, 11 (5th Cir. 1968) (Florida law); <u>Kojic v. City of New York</u>, 428

---

[2] <u>Defendant's Reply</u> at 2.

N.Y.S.2d 305, 307-308 (N.Y. App. Div. 1980).  Whether the employer had such knowledge is a question of fact.  Requarth v. Brophy, supra, at 125-26.

Plaintiffs argue that Trick was aware that the fuel was being unloaded into drums and is liable for failure to interfere to put a stop to Farmland's use of the pumping method, or to inquire into Farmland's safety precautions and thereafter warn Farmland not to use the pump.[3]  However, as Defendant correctly points out,[4] the record shows that Trick knew only that the gasoline was being unloaded into drums; plaintiffs have pointed to no evidence indicating that Trick was aware of or involved in any way with the method Farmland would use to fill plaintiffs' drums, including using a pump, dispensing the fuel at night, into drums located inside an enclosed space, and allowing customers to assist with the unloading.

The standard is whether the employer had "actual or constructive knowledge" of the dangerous condition or practice.  See Seal, supra at 747, quoting such language in Kojic, supra.  In this case, there is nothing on the record to indicate that Trick knew or had reason to know of the practices used by Farmland in dispensing fuel to customers, nor is there anything on the record to indicate that Trick had a duty of inquiry regarding the methods of the independent contractor whom it hired to deliver the fuel, particularly when this particular contractor had delivered Trick's gasoline to these particular plaintiffs, without incident, a number of times over the past five years.[5]  Thus, there is no issue of fact on this record which would invoke the "failure to interfere" basis for direct liability.

---

[3] Plaintiffs' Response at 7.

[4] Defendant's Reply at 6.

[5] Exhibit C to Defendant's Reply, Deposition of Carol Fox, at 15-17.

3.  <u>Trick is strictly liable under New Mexico law for the inherently dangerous activities of its independent contractor, Farmland</u>.

a.  <u>Liability for inherently dangerous activities in New Mexico</u>.

The generally accepted view of this sort of liability is that it may be vicariously imposed. In other words, even though the employer has done everything reasonably required of him, public policy nevertheless imposes a nondelegable duty on him when the work is "inherently dangerous" or entails a "peculiar risk of harm" so that injuries are likely to result unless special precautions are taken.  <u>See</u>, <u>Restatement (Second) of Torts</u>, §§ 416 and 427.  However, New Mexico law is applicable in this diversity action, and New Mexico's approach differs from that of other jurisdictions on the question of employer liability for the inherently dangerous activities of its independent contractor.

Prior to <u>Saiz v. Belen Sch. Dist.</u>, 827 P.2d 102 (N.M. 1992), New Mexico followed the traditional approach to this sort of liability.  In a 1953 case, the New Mexico Supreme Court set forth a standard statement of the rule:

> It is a general rule that an employer is not liable for the negligence of an independent contractor; however, there are certain exceptions to the rule.  Work that is intrinsically and inherently dangerous in performance is not delegable so as to escape liability . . .   The proper test . . . is whether danger inheres in the performance of the work . . .   One who owes, and is personally bound to perform, an absolute and positive duty to the public or an individual cannot escape the responsibility of seeing that duty performed by delegating it to an independent contractor, and will be liable for injuries resulting from the contractor's negligence in the performance thereof, whether the duty is imposed by [statute, contract, or common law].

Pendergrass v. Lovelace, supra, at 232.[6]

New Mexico departed from the traditional rule in the 1992 Saiz case.  In that case, the New Mexico Supreme Court emphasized that the liability of an employer, for inherently dangerous activity undertaken by its independent contractor, is direct rather than vicarious; that is, it is "direct strict liability for the absence of required precautions . . . [rather than] vicarious liability for the negligence of the independent contractor." Saiz at 108.  After Saiz, the reason for imposing liability is the absence of reasonable precautions, rather than any negligence on the part of the contractor.[7]

The Saiz court zeroes in on "precautions," holding this to be the main focus of the employer's liability.  Restatement §416 calls for employer liability for work which creates peculiar risks "unless special precautions are taken," and §427 defines inherently dangerous work as that involving a special danger to others which is inherent in the work and causes injury to others due to the contractor's "failure to take reasonable precautions" against such danger.  Saiz states that the "special precautions" of §416 and the "reasonable precautions" of §427 are the same thing,

_____

[6] The reason for this exception to employer nonliability is that "[p]ublic policy demands that 'third' persons who are injured during the performance of inherently dangerous work must be protected from the strength of the judicially created entity called 'employer - independent contractor' relationship." Montanez v. Cass, 546 P.2d 1189, 1194 (N.M. App. 1975), reversed in part on other grounds, 551 P.2d 634 (N.M. 1976).  "The policy of allocating to the general entrepreneur the risks incident to his activity is obvious when the activity carries with it extraordinary hazards to third persons." Budagher v. Amrep Corp., 637 P.2d 547, 551 (N.M. 1981).

[7] Although Saiz involved an employer who was also the landowner, the opinion does not limit itself to premises liability situations.  Most New Mexico cases on employer - independent contractor liability do involve employer/landowners, but there are exceptions; see, e.g., Scott v. Murphy, supra.  And the rules of liability for an independent contractor's actions apply generally to all employers regardless whether they own or control the property on which the injury occurred.

referring generally to "precautions made reasonably necessary by a peculiar risk or a special

danger." <u>Saiz</u> at 109 n. 6.

> We reject any requirement apparent from Section 416 of the
> Restatement that liability of the employer is dependent upon failure
> of the independent contractor to exercise reasonable care.  The
> focus is on the presence or absence of a necessary precaution, not
> on whether an independent contractor's failure to take the
> precaution may be excused or justified under a reasonably prudent
> person standard.  The test of liability is the presence or absence of
> precautions that would be deemed reasonably necessary by one to
> whom knowledge of all the circumstances is attributed; and liability
> is dependent on neither the lack of care taken by the contractor nor
> the lack of care taken by the employer to ensure that the contractor
> takes necessary precautions.

<u>Saiz</u> at 110.

The standard of "knowledge of all the circumstances" was restated by the Court of

Appeals in <u>Hinger v. Parker & Parsley Petroleum Co.</u>, <u>supra</u>, at 1041:

> Taken alone, the duty to ensure 'reasonable precautions' is no more
> than a restatement of ordinary care . . .  The duty to ensure
> reasonable precautions does not, by itself, distinguish strict liability
> under <u>Saiz</u>; it is when that duty is imposed as an absolute standard
> of conduct, regardless of the employer's own exercise of care or
> state of knowledge, that strict liability is established as a byproduct
> of engaging in inherently dangerous work.

The <u>Saiz</u> court restates the New Mexico rule that the question of whether an activity is

inherently dangerous is "a pure question of law"; however, the court adds, "there may be gray

areas requiring fact-finding."  Once the court determines that an activity is inherently dangerous,

then "the jury decides under the evidence and by expert and lay testimony: (1) what precautions

would be deemed reasonably necessary by one to whom knowledge of all the circumstances is

attributed, and (2) whether the absence of a necessary precaution was a proximate cause of the

injury."  <u>Saiz</u> at 111.  Thus, the court seems to contemplate an elaborate factual presentation, with

"expert and lay testimony."  In a later case, the Court of Appeals described this procedure as

follows:  the court first decides whether the activity is inherently dangerous; if so, the jury is to be

given "special interrogatories" asking the two factual questions noted above.  <u>Hinger v. Parker &</u>

<u>Parsley Petroleum Co.</u>, <u>supra</u>, at 1039.

The <u>Saiz</u> formulation requires a factual determination which cannot be made on summary

judgment except, of course, in the clearest of cases.  "The court determines the presence of a

peculiar risk and the need for precautions.  The factfinder determines what reasonable precautions

were necessary.  Liability is based upon a showing of injury proximately caused by the absence of

the necessary precautions."  <u>Saiz</u> at 114.  The parties herein have not even discussed this aspect of

<u>Saiz</u> in their memoranda, and certainly Trick Enterprises, as the moving party on this summary

judgment motion, has failed to make an adequate showing as to what precautions a reasonable

person would find necessary, or proximate cause.  Thus, under <u>Saiz</u>, summary judgment must be

denied in this case if handling gasoline as it occurred herein is an inherently dangerous activity.

The Court finds that it is.

> b.  <u>Gasoline handling as it occurred in this case is an inherently</u>
> <u>dangerous activity</u>.

The <u>Saiz</u> court notes that inherently dangerous activities:

> represent an intermediate category of hazardous activity between
> those that are nonhazardous (or only slightly so), in which harm is
> merely a foreseeable consequence of negligence, and activities that
> are ultrahazardous, in which the potential for harm cannot be
> eliminated by the highest degree of care.  We believe the high
> probability or relative certainty that harm will arise in the absence of
> reasonable precautions distinguishes this intermediate category.

Saiz, at 111.  The court goes on to say that work is inherently dangerous if it is "very likely to cause harm if a reasonable precaution against the peculiar risk or special danger is not taken . . . More than mere foreseeability of injury is required.  The hazard must be substantial" in the sense that there is a strong probability, rather than a mere possibility, that injury will occur if proper precautions are not taken.  Saiz at 111.

Defendant Trick Enterprises argues in its memorandum that the handling of gasoline products is not an "ultra-hazardous" activity, which it defines as an activity necessarily involving a risk of serious harm "which cannot be eliminated by the exercise of utmost care, and is not a matter of common usage . . .."[8]  Defendant mistakenly focuses on the alleged ultrahazardous nature of the activity and thus attempts to limit its summary judgment burden to a showing that the handling of gasoline is not ultrahazardous.  However, defendant actually has the heavier burden of showing that the activity is not "inherently dangerous," defined as risky enough that it will probably result in injury if reasonable precautions are not taken.  An employer may be liable under the "inherently dangerous" principle for activities for which it would not be strictly liable under the "ultrahazardous" doctrine, since far fewer activities are ultrahazardous than are inherently dangerous.  Whether an activity is inherently dangerous is an issue of law to be decided by the court.  Saiz v. Belen Sch. Dist., supra, at 111; Gabaldon v. Erisa Mortgage Co., 949 P.2d 1193, 1197 (N.M. App. 1997), cert. granted, 949 P.2d 282 (1997).

There is no New Mexico case dealing with whether delivering gasoline in bulk is inherently dangerous.  In  Schwartzman, Inc. v. Gen. Elec. Co., 848 F. Supp. 942 (D.N.M. 1993), Judge Mechem held that the handling, transportation, storage, or disposal of petroleum products

---

[8] Defendant's Memorandum at 5.

is not ultrahazardous, because the risks of petroleum handling "can be eliminated by the exercise of reasonable care." He therefore refused to impose strict liability for the handling of gasoline products. He also acknowledged, however, that "hazardous materials and petroleum products may present a substantial degree of risk to persons or property when mishandled." Thus Judge Mechem implicitly recognized that, even if petroleum products are not ultrahazardous, they are nevertheless inherently dangerous as defined in Saiz (at 111): "[a] high probability or relative certainty that harm will arise in the absence of reasonable precautions." Schwartzman, however, did not directly address the question of whether gasoline is inherently dangerous, and the Court must look beyond New Mexico authority to analyze this question.

Defendant cites several cases from other jurisdictions to support its argument that the handling of gasoline is not "an inherently dangerous or ultra-hazardous activity."[9] The two most pertinent are Allen v. Cooper, 244 S.E.2d 98, 99 (Ga. App. 1978); and Brewer v. Appalachian Constrs., Inc., 76 S.E.2d 916 (W.Va. 1953). In Allen, the court stated that, "the pouring of the fuel into a gas tank was *not* inherently dangerous work [emphasis by the court]"; however, the negligence in that case involved pouring the wrong kind of fuel into an airplane's tank, resulting in an emergency landing. Thus, it was not an inherent property of the gasoline itself -- such as the fact that it is harmful to lungs and skin, or that it is potentially explosive -- which led to the injury; rather, it was the fact that a different sort of fuel was called for. The Allen court seemed to be using "inherently dangerous" language when what it was really doing was deciding that the contractor's negligence was collateral to the inherent risk of the material (an issue discussed below).

_____

[9] Defendant's Memorandum at 5.

Another case cited by defendant is <u>Brewer v. Appalachian Constrs., Inc.</u>, 76 S.E.2d 916 (W.Va. 1953).  On facts somewhat similar to those in the present case, the court held that the handling of gasoline is not an inherently dangerous activity so as to impose liability on the employer of an independent contractor, who delivered gasoline to a purchaser and caused an explosion by allowing the gasoline to overflow as it was being dispensed into a tank.  This Court declines to follow <u>Brewer</u> in its holding that delivery of bulk gasoline is not inherently dangerous, in part because it uses a different definition of "inherently dangerous" than that employed by the New Mexico courts.  In addition, the <u>Brewer</u> court (at 925) makes the rather confusing statement that, "[w]hile it is true that the careless and negligent handling of gasoline is inherently dangerous, likewise it is true that if the gasoline in the instant case had been handled in a careful manner, Brewer would not have suffered the injuries complained of in this action."  This statement indicates that the West Virginia court failed to:

> mak[e] the not altogether obvious distinction between work done
> by an independent contractor which is intrinsically dangerous in that
> harm will likely result if precautions are not taken, and work which
> is not intrinsically dangerous in that it is merely the sort of work
> which could produce injury if carelessly performed.

<u>Deitz v. Jackson</u>, 291 S.E.2d 282 (N.C. App. 1982).

In addition to finding <u>Brewer</u> distinguishable, this Court simply disagrees with the West Virginia court that the bulk delivery of gasoline, at least as it occurred in this case, is not inherently dangerous.  Other courts have found that similar distribution of gasoline is an inherently dangerous activity.  <u>Trexler v. Tug Raven</u>, 290 F. Supp. 429 (E.D. Va. 1968), <u>rev'd on other grounds</u>, 419 F.2d 536 (4th Cir. 1969), involved liability of a barge owner for the alleged negligence of an independent contractor leading to a "disastrous fire" that occurred during the

pumping of gasoline from a barge into onshore tanks.  The district court held the barge owner

liable based on the contractor's negligence, on grounds that "[t]he nature of the activity in loading

and discharging the combustible fuel is recognized as a hazardous undertaking . . . [under]

Restatement, Torts, sections 416, 427, and 427A . . .."  Section 427A deals with "abnormally

dangerous," or ultrahazardous, activities, and the Trexler court therefore goes beyond even

"inherently dangerous" in its treatment of gasoline handling.[10]

Two cases hold that the storage of large amounts of gasoline near residential areas is

ultrahazardous or "abnormally dangerous," given the possibility of leakage into water and sewer

lines.  Yommer v. McKenzie, 257 A.2d 138, 141 (Md. App. 1969); City of Northglenn v.

Chevron U.S.A., Inc., 519 F. Supp. 515 (D. Colo. 1981) ("This is not merely fuel, but a highly

volatile, explosive, and toxic substance as well as one of the most powerful solvents commonly

available").  There is contrary authority, including the Schwartzman case (in which however, as

noted above, the court implicitly defined the handling of gasoline as inherently dangerous, even

while holding that it is not ultrahazardous).  However, the Court finds more persuasive those

cases holding that bulk gasoline delivery is an inherently dangerous activity.

Defendant argues that "the dispensing of gasoline is . . . an activity routinely engaged in by

everyone of driving age,"[11] and thus that it cannot be either ultrahazardous or inherently

dangerous.  There is some case authority to support this "common usage" argument, mostly from

---

[10] On appeal, the Fourth Circuit reversed the finding of negligence on the part of the
independent contractor and exonerated the barge owner who had employed the contractor,
finding an entirely different defendant liable.  The question of gasoline handling as an inherently
dangerous activity dropped out of the case, and the Circuit Court had no comment on this issue.

[11] Defendant's Reply at 5.

older cases; <u>see</u>, <u>e.g.</u>, <u>Sarno v. Gulf Refining Co.</u>, 124 A. 145, 146 (N.J. 1924) ("We must judicially observe ... that gasoline is a motive fluid in general public use as was kerosene in the days preceding the introduction of gas and electricity, and that there is nothing inherently dangerous in its ordinary use, removal, or carriage ..."); <u>Collins v. Liquid Transporters</u>, 262 S.W.2d 382, 382-83 (Ky. App. 1953) ("Gasoline is an article in common usage, and the transportation of it in substantial quantities upon the public highways is an essential step in the creation and maintenance of that common usage"); <u>Ozark Industries, Inc. v. Stubbs Transports, Inc.</u>, 351 F. Supp. 351, 357 (W.D. Ark. 1972) ("The transportation of gasoline in tank trucks from the distributing centers to filling stations is a matter of common everyday occurrence of which the court may take judicial notice").

While the question of "common usage" is not irrelevant to the issue of whether an activity is inherently dangerous, it is a more persuasive factor in cases involving ultrahazardous activities, as it is included as an explicit element of the definition of "abnormally dangerous" under Restatement (Second) of Torts, §520(d).  <u>See</u>, <u>e.g.</u>, <u>Zero Wholesale Gas Co., Inc. v. Stroud</u>, 571 S.W.2d 74, 76-79 (Ark. 1978), in which the court, in holding delivery of propane gas to be ultrahazardous, noted that although propane is a common substance, the delivery of propane is not a "matter of common usage," basing its ruling in part on the fact that the activity is regulated

by statutes directed at the public safety.

In addition, the type of gasoline delivery at issue in this case was not a routine stop at a gas station.  Plaintiffs had contracted to purchase over 1,000 gallons of gasoline from Trick, to be dispensed into a number of 55-gallon drums, an activity requiring three people.  The Washington Supreme Court has noted, in holding that the transporting of gasoline is an ultrahazardous activity for which strict liability will be imposed:

16

> When gasoline is carried as cargo -- as distinguished from fuel for the
> carrier vehicle -- it takes on uniquely hazardous characteristics, as
> does water impounded in large quantities.  Dangerous in itself,
> gasoline develops even greater potential for harm when carried
> as freight -- extraordinary dangers deriving from sheer quantity, bulk,
> and weight, which enormously multiply its hazardous properties . . .
> Gasoline is always dangerous whether kept in large or small
> quantities because of its volatility, inflammability and explosiveness.

Siegler v. Kuhlman, 502 P.2d 1181, 1184-85 (Wash. 1972).

The handling of large quantities of gasoline, a volatile, flammable, and toxic substance, as it was undertaken in the present case, was "very likely to cause harm" without reasonable precautions. As plaintiffs point out, truck drivers are required to carry safety manuals in their vehicles which address the procedure for handling hazardous materials such as refined fuels.[12]

And it is not only the quantity of gasoline which makes the activity in this case inherently dangerous.  The practice of unloading gasoline in the dark, using a pump, employing the assistance of customers who perch on top of the drums with a flashlight, inside a van in an enclosed space higher than ground level, could certainly be found to be the absence of reasonable precautions.  At the very least, there is an issue of fact as to what precautions would be deemed reasonably necessary under these circumstances and whether their absence in this case was the proximate cause of plaintiffs' damages.

Although this holding is limited to the facts of this case, the Court finds as a matter of law that the delivery of bulk gasoline as done herein is an inherently dangerous activity and leaves for the jury the "gray areas requiring fact-finding," including the necessary reasonable precautions and the question of proximate cause.

---

[12] Plaintiffs' Response at 6, and Exhibit 3 thereto, Deposition of Lynn Harris, at 10-13.

    c. <u>Carol Fox's injuries were caused by a risk that was not "collateral" to the inherently dangerous properties of gasoline.</u>

Trick argues that, even if handling bulk gasoline is an inherently dangerous activity, the injuries that occurred in this case were collateral to the risk.  Conduct is "collaterally negligent" when it does not involve the risks that make the work peculiarly dangerous.  The collateral negligence doctrine has been described as "an exception to an exception" which relieves the employer of liability if: (1) the contractor's negligence consists solely in the improper manner in which he does the work; (2) it creates a risk of harm which is not inherent in or normal to the work; and (3) the employer had no reason to contemplate the contractor's negligence when the contract was made.  <u>Otero v. Jordan Restaurant Enters.</u>, 895 P.2d 243, 246 (N.M. App. 1995), citing <u>Restatement (Second) of Torts</u> §426.

Although it may well be true in this case that the contractor's negligence did "consist solely in the improper manner in which he did the work," nevertheless, defendant has not made an adequate showing that the risk was foreign to the dangerous properties of gasoline.  "The distinction is not . . . essentially one between operative detail and general method.  It is rather one of negligence which is unusual or abnormal, or foreign to the normal or contemplated risks of doing the work, as distinguished from negligence which creates only the normal or contemplated risk."  <u>Restatement (Second) of Torts</u> §426 cmt. a (1965).

Trick argues that the "contemplated risk with gasoline must be explosion and fire," and that the risk of being doused with gasoline and unable to breathe, rather than being subjected to explosion or fire, is a risk "foreign to the contemplated risk of doing the work."[13]   Plaintiffs counter

---

[13] <u>Defendant's Reply</u> at 5-6.

18

that the fuel involved in this case is a skin irritant, and its fumes are potentially overwhelming. The manner in which this accident happened, what with plaintiff leaping from the van and crushing her heels, is not the first sort of injury which leaps to mind when one thinks of the dangerous properties of gasoline.  Nevertheless, being overcome with gasoline fumes is not completely foreign to the risk inherent in a substance like gasoline.  It is not only its flammable and explosive properties which make gasoline dangerous, but also its toxicity to human skin and lungs.  Whether a particular event is collateral to the contemplated risk is "usually an issue of fact," Otero v. Jordan Restaurant Enters, supra at 724, and in this case the question will be left to the jury.

  C. Farmland Industries was the independent contractor of Trick Enterprises.

  Trick argues that the rules regarding an employer's liability for the acts of its independent contractor are irrelevant in the present case, because Farmland was not its independent contractor at all and thus Trick had no responsibility for anything done by Farmland or its employee.

  Trick's assertion that it had no employer - contractor relationship with Farmland is based on an argument that, at the time of Carol Fox's injury, Trick no longer owned the gasoline being carried in the Farmland truck.  Under the Uniform Commercial Code, defendant argues, the designation "F.O.B. Borger TX" means that ownership of the gasoline was transferred to the Foxes once Trick delivered it to Borger, Texas and Farmland took it up.  From this, Trick contends that it had no interest in, and hence no liability for, anything that happened to or with the gasoline once the delivery to Borger was completed.[14]   Defendant cites no authority to support its argument that lack of ownership means lack of liability, other than cases dealing with the issue of when title passes in connection with an F.O.B. sale.  These cases do not bear on the issue of the effect of ownership of

---

  [14] Defendant's Memorandum at 3-5.

material on an employer's liability for acts of an independent contractor who hauls the material to the employer's customers.

Trick Enterprises, as a seller of bulk gasoline, did not give up all interest in the fate of the gasoline once it was delivered to Borger, F.O.B. or not. It is undisputed that Trick Enterprises hired Farmland Industries to deliver the petroleum which plaintiffs had purchased from Trick. The Foxes were Trick's longstanding customers, and certainly Trick had a business interest in ensuring that the purchased product reached its customers.

Inherent in the definition of independent contractor is the principle that "[t]he result to be achieved by the independent contractor [as opposed to the means used to reach that result] is controlled by the employer." Roybal v. Bates Lumber Co., 412 P.2d 555, 557 (N.M. 1966); Shaver v. Bell, 397 P.2d 723, 727 (N.M. 1964). Trick may not have had control over the details of Farmland's methods in delivering the gasoline to the Foxes, but it did have "control over the result to be achieved," in the sense that it hired Farmland to achieve a particular result -- that is, to complete a business transaction begun when plaintiffs called Trick and ordered gasoline. If the gasoline never arrived, surely Trick would have taken the responsibility for finding out what happened to it, rather than telling an established customer that it had no interest in the gasoline once it had been delivered F.O.B. Borger TX. The fact that Trick did not own the gasoline at the time of the incident is irrelevant to its liability as the employer of an independent contractor.

Although there is little case law on this question, it appears that the New Mexico courts would, if faced with the issue, find that ownership of a substance is not the determining factor in assigning liability for injuries caused by its misuse. One issue in Scott v. Murphy Corp., 448 P.2d 803 (N.M. 1968), was liability of an employer (Murphy) for a fire and explosion occurring during

the unloading by an independent contractor (McWood) of "drilling fluid," or crude oil, at a well site.  Murphy, the employer, was required by contract to deliver the oil to the site, at Murphy's sole expense.  The injured party  argued that the fact that Murphy was obligated to and did furnish the drilling fluid at its own expense made the work of unloading the fuel Murphy's work, so that McWood's employee became Murphy's during the course of the work.  The court rejected this argument and refused to impose liability on Murphy for the acts of McWood's employee, invoking the general rule of employer nonliability.  (The exception for inherently dangerous work appears not to have been raised or decided).  Although not directly on point, this case does indicate that, in New Mexico, contractual provisions as to who owns the injury-causing material, or who pays for its transport, do not override common law liability.   And in Harmon v. Atlantic Richfield Co., 623 P.2d 1015, 1020 (N.M. App. 1981), although again not directly on point, the Court of Appeals similarly rejected ownership of the injury-causing instrumentality as a criterion relevant to employer - independent contractor liability.

Under New Mexico law, Farmland was Trick's independent contractor.  Trick had the right to control the ultimate result of the transaction:  delivery of gasoline in a manner satisfactory to the purchasing customer.  The exact point along the route at which ownership of the gasoline shifted from Trick to the Foxes, under the laws of commerce, is not relevant to the question of Trick's liability under common law principles for the acts of the contractor which it hired to complete the delivery.

### III.  Conclusion.

The Court DENIES defendant's motion for summary judgment.  An Order in accordance with this Memorandum Opinion will issue.

21

Dated at Albuquerque this 22$^d$ day of June, 1998.


BRUCE D. BLACK
United States District Judge